IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JASON WILLIAM CUSTER,

                          Petitioner,                     **8:18CV224**

           vs.

SCOTT FRAKES, Director, NE Dept. of              **MEMORANDUM**
Corrections; and BRAD HANSEN,                    **AND ORDER**
Warden, Tecumseh State Correctional
Institution;

                          Respondents.

        This matter is before the court on Petitioner Jason William Custer's
("Petitioner" or "Custer") Petition for Writ of Habeas Corpus. (Filing 1.) For the
reasons that follow, Petitioner's habeas petition is denied and dismissed with
prejudice.

## I.  CLAIMS

        Summarized and condensed,[1] and as set forth in the court's prior progression
order (filing 7), Petitioner asserted the following claims that were potentially
cognizable in this court:

        Claim One:          Petitioner was denied effective assistance of counsel
                            because trial counsel (1) elicited testimony from Dr. Peter
                            Schilke regarding information in a report authored by a
                            different expert (filing 1 at CM/ECF pp. 17, 19); (2) failed

_____

        [1] Petitioner did not object to the court's summary and condensation.

1

to object to the foundation of Dr. Schilke's testimony (*id.*); (3) failed to call Dr. Eischenschmidt to testify regarding the toxicology report he authored (*id.*); (4) failed to provide proper jury instructions on self-defense, assault, and terroristic threats (*id.* at CM/ECF pp. 3, 17); (5) failed to object to prosecutorial misconduct and/or ask for a mistrial (*id.* at CM/ECF pp. 17, 26-27); (6) insisted that a key state's witness, Billy Fields, was testifying falsely to information supported by the record and critical to Petitioner's self-defense claim (*id.* at CM/ECF pp. 18, 32); and (7) refused to call trial counsel's law partner, Kelly Breen, as a witness to testify about prior consistent statements made by Petitioner shortly after he was arrested and appointed counsel (*id.*).

Claim Two:       Petitioner was denied the effective assistance of counsel because appellate counsel failed to raise on direct appeal the claims described in Claim One, subparts (1) through (3) and (5) through (7). (*Id.* at CM/ECF pp. 17–19, 27, 32.)

Claim Three:     Petitioner was denied the effective assistance of counsel because the cumulative instances of ineffective assistance of trial and appellate counsel create the reasonable probability of a different outcome at either the trial and/or direct appeal level. (*Id.* at CM/ECF p. 20.)

Claim Four:      Petitioner was denied his rights to due process and a fair trial because (1) the evidence adduced at trial was insufficient to sustain a conviction for First Degree Murder, because a rational trier of fact could not have concluded that Petitioner killed Adam McCormick purposely, with deliberate and premeditated malice, and

not in self-defense (*id.* at CM/ECF pp. 17, 21); and (2) the trial court erroneously instructed the jury (*id.* at CM/ECF pp. 2, 17, 28).

Claim Five:   Petitioner was denied due process because the State committed prosecutorial misconduct by (1) arguing his post-arrest silence, (2) introducing inflammatory, religious-themed arguments and testimony into the trial, and (3) "brow-beating" Petitioner with questions already asked and answered. (*Id.* at CM/ECF pp. 17, 26.)[2]

## II.  BACKGROUND

### A.  Convictions and Sentences

The court states the facts as they were recited by the Nebraska Supreme Court in *State v. Custer*, 871 N.W.2d 243 (Neb. 2015) (filing 9-1). *See Bucklew v. Luebbers*, 436 F.3d 1010, 1013 (8th Cir. 2006) (utilizing state court's recitation of facts on review of federal habeas petition).

The charges against Custer arose from an incident in which he shot and killed Adam McCormick outside a residence in Sidney, Nebraska, on November 3, 2012. In the information filed in the district court for Cheyenne County, Custer was originally charged with second degree murder and use of a firearm to commit a felony. The information was amended to upgrade the murder charge to first degree and to add a charge of being a felon in possession of a firearm. Custer was alleged

---

[2] The court dismissed Claim Six because it was based on errors in the state postconviction proceedings and thus not a cognizable habeas corpus claim. (Filing 7 at CM/ECF p. 3 (citing *Jenkins v. Houston*, 4:05CV3099, 2006 WL 126632 (D. Neb. 2006) (collecting cases holding that errors during state postconviction review are not cognizable in a federal habeas corpus action).)

to be a habitual criminal, but the State ultimately chose not to pursue the habitual criminal enhancement.

Custer grew up in Chico, California, where he met and became friends with Billy Fields. In 2012, Custer decided to move to Humboldt, Nebraska, where his son and his son's mother lived. Fields was then living in Sidney with his girlfriend, Amber Davis. Fields invited Custer to stay with him and Davis for a time while he was in the process of moving to Humboldt. Custer arrived in Sidney on October 5. While in Sidney, Custer met various friends of Davis, including McCormick and Syrus Leal.

After Davis told Custer and Fields they needed to move out of her house, Fields arranged for the two to stay at another friend's apartment. At around this time, in mid-October, McCormick gave Custer $150. Although Custer testified that the money was a loan to help Custer pay his share of rent and utilities at the new apartment, Fields and Leal testified that McCormick gave Custer the money to purchase drugs and that after Custer failed to deliver the drugs, McCormick wanted his money back. Custer testified that he intended to pay McCormick back after he received an unemployment check on October 16, 2012, but that he ended up using the money from the check to pay other expenses. On or around October 20, McCormick came to the apartment where Custer and Fields were staying to collect the money. After Custer told McCormick he would pay him from his next check, Fields, who was upset that McCormick had come to confront Custer, told McCormick that he would pay McCormick by the end of the week. In the following days, McCormick exchanged threatening text messages and telephone calls with Custer and Fields.

On or about October 26, 2012, Custer and Fields attended Halloween parties at some local bars. While they were walking between bars, McCormick confronted them, demanding his money. Fields testified that when McCormick approached them, it looked like McCormick was reaching into his pocket for something, and that Fields thought it was a knife that he knew McCormick carried. Custer and Fields

told McCormick they could not repay the $150 at that time, but in order to calm McCormick, Fields paid him $40 for another debt he owed. Fields testified that he later met up with Leal, who told him that the money McCormick gave Custer was actually Leal's and that the money should be repaid to him rather than to McCormick. Custer thought the matter had been resolved by agreeing to pay Leal, but McCormick later sent text messages to Custer and Fields suggesting that the matter could be resolved if they both left town.

A few days later, on November 1, 2012, McCormick sent Fields text messages threatening physical violence if the debt was not repaid soon. The text messages prompted Custer to arrange with McCormick to meet in a park for a fight. Custer and Fields went to the park at the arranged time. McCormick did not show up, but he continued to exchange confrontational text messages and telephone calls with Custer and Fields.

Custer and Fields went to Davis' house that night and told her about the ongoing conflict with McCormick. Other friends of Davis were at her house and heard about the conflict. Evidence at trial showed that the gun that was later used to shoot McCormick belonged to one of Davis' friends, but there was a conflict in the evidence as to how the gun came into Custer's possession. Fields testified that at Davis' house on November 1, 2012, Custer had talked to this friend about obtaining a gun and that after the shooting, Custer told Fields that prior to the shooting, he had kept the gun stashed in a culvert behind the apartment building where they were staying. In contrast, as will be discussed further below, Custer testified that he found the gun in Fields' truck immediately before the shooting and that he had not known before that time that the gun was in the truck.

The next night, November 2, 2012, Davis hosted a gathering at her house. A conflict arose when Davis saw that McCormick had come to her house with Leal. Davis insisted that McCormick leave. Davis sent text messages to Custer and Fields, who were not at Davis' house, letting them know about her confrontation with McCormick. She also let them know that the gathering was relocating to Leal's

house, that McCormick would be there, and that although Custer and Fields should not fight McCormick there, they could "be waiting and watching for him." The conflict between Davis and McCormick continued at Leal's home. Throughout the evening, Davis updated Custer and Fields through text messages and telephone calls regarding McCormick's activities and whereabouts. Around 11:20 p.m., Custer responded to one of Davis' updates with a text message stating that he and Fields were coming over to handle matters with McCormick.

Custer testified that throughout the night of November 2, 2012, he had also been exchanging text messages and telephone calls with McCormick and that although Custer tried to explain to McCormick that Fields was going to repay the money, McCormick continued to threaten him. Around 11:35 p.m., Custer asked McCormick whether they could "FINISH THIS RIGHT NOW ONE ON ONE." McCormick responded in the affirmative about 15 minutes later. In the same timeframe, Custer was exchanging texts with Davis to see whether anyone at Leal's home would have a problem if Custer came there to resolve things with McCormick. Custer testified that in light of mixed messages he received from both Davis and McCormick, he determined it would be better to wait until McCormick left and then come to resolve things with Leal instead of with McCormick.

Shortly after midnight on November 3, 2012, Davis texted Custer saying that McCormick was leaving the gathering at Leal's house. Custer borrowed Fields' truck to drive to Leal's house. Fields did not accompany Custer. When Custer arrived at Leal's house, he saw that McCormick, Leal, and Joshua Wright were standing outside on the lawn. Thereafter, an incident ensued in which Custer shot McCormick twice. The testimony at trial presented differing stories regarding the incident; therefore, Custer's testimony regarding the incident will be presented herein after discussion of Leal's and Wright's testimony.

Leal testified that after midnight on November 3, 2012, he, McCormick, and Wright were leaving the house; Wright was going to walk home, and Leal was going to give McCormick a ride home. As they were leaving, a truck pulled up to the house.

6

When Leal saw the truck arrive, he thought it was Fields until he heard Custer call McCormick's name. Custer left the truck idling with the lights on while he got out of the truck and headed straight toward McCormick. Leal did not see a gun but as soon as McCormick responded to Custer's calling his name, Leal heard a shot and saw McCormick buckle over. Leal heard another shot 1 or 2 seconds after the first shot. Leal went to attend to McCormick; he tried to catch McCormick's fall, but McCormick was already on the ground. Leal looked up and saw that Custer was almost back to the truck. Leal ran toward the truck and punched at Custer through the open window. Leal saw a gun on the seat next to Custer as Custer drove away in the truck. Leal then turned to see McCormick trying to walk around Leal's Jeep, which was parked in the driveway. By the time Leal reached McCormick, he was on the ground again.

Wright testified that he, Leal, and McCormick were standing in front of Leal's house smoking after midnight on November 3, 2012, when a truck pulled up and stopped in the street. Wright did not recognize the truck, but one of the other men said it belonged to Fields. Wright started to walk toward the truck because he knew about the tension between McCormick and Fields and he wanted to tell Fields to "chill out." The truck was still running with its lights on. A man got out of the truck, and Wright realized that it was not Fields and that, instead, it was Custer. Custer walked toward the front door of the house. At first Wright did not see anything in Custer's hands, but when Custer picked up his hands, Wright saw that he had a black assault rifle. Custer raised the rifle to his shoulder, and Wright moved to escape. Wright heard Custer call for McCormick, and then he heard a shot. Wright did not see where the shot had been fired because he was trying to escape. Wright heard another shot 1 or 2 seconds later, and then he saw Custer return to the truck. Wright saw Leal run to the truck and punch Custer before the truck left quickly. After he saw the truck leave, Wright started to run home, but when he heard Leal yell for him, he ran to the driveway where he saw McCormick on the ground. McCormick was unresponsive and bleeding, so Wright called for emergency assistance.

Other evidence presented by the State indicated that the bullet from the second shot entered McCormick's body under the left arm, continued in a downward trajectory, nicking a rib and perforating McCormick's lower left lung, esophagus, and liver, and exited his right side. McCormick died as a result of the gunshot wounds. In addition, an officer who arrived at the scene shortly after the shooting testified that he searched McCormick's pockets and that he found a pocketknife inside McCormick's front left pants pocket. The officer testified that when he found the pocketknife, it was closed up and clasped and was all the way inside the pocket. The officer further testified that he did not find any other weapon in McCormick's proximity.

Custer testified in his own defense at trial. He testified that when he arrived at Leal's house, he was confused that McCormick was still there and that he became concerned he was being set up. Custer therefore retrieved a gun that was in the back seat of the truck. Custer testified that he did not know that the gun was there until after he became concerned about a setup and started looking through the truck to find something to protect himself. Custer concealed the gun under his coat as he got out of the truck. As he walked up the driveway, he told McCormick that he was there "to talk so we can settle this." Custer testified that McCormick replied, "yeah, I'm going to settle it," and that then McCormick pulled out a knife and rushed at Custer. Custer testified that he backed up but ran into a Jeep that was parked in the driveway and could not retreat farther. He therefore pulled the gun out and fired a shot aimed at McCormick's knee as McCormick ran at him with the knife raised. McCormick continued toward Custer, despite having been shot in the thigh. As McCormick lunged at Custer with the knife, Custer jumped out of the way, raised the gun, and fired a shot as he twisted.

Custer testified that Leal began to scream at him and chase him; so he got back to the truck and returned to the apartment where he had been staying. He called Fields to tell him that he had shot at McCormick, and Fields made arrangements for Davis to pick up Custer and get him out of town. Custer stayed at a motel in Big

8

Springs, Nebraska, until some hours later when police came to arrest him based on a tip from Fields and Davis.

During the State's cross-examination of Custer, it asked questions which pointed out that shortly after the shooting, Leal and Wright gave statements to police consistent with their testimony at trial, while Custer "had 15 months" and "the opportunity to sit through all of the trial and listen to all of the testimony" before he testified to his version of events. The State also asked questions which pointed out that after the shooting, Custer had made no attempt to report to the police the shooting or McCormick's alleged aggressive actions. Custer did not object to any of these questions.

Argument at the jury instruction conference shows that Custer requested a "choice of evils" instruction with respect to the charge of being a felon in possession of a firearm. He argued that the instruction was appropriate because of his testimony that he grabbed the gun he found in the back seat of the truck only because he was concerned that he was being set up when he arrived at Leal's house and that he needed to protect himself. The court refused such an instruction after determining that such an instruction was not appropriate under the facts of this case. Custer also objected to an instruction defining premeditation because the instruction included a statement to the effect that the "time needed for premeditation may be so short as to be instantaneous," which statement was not included in the statutory definition of premeditation. The court overruled Custer's objection and gave the instruction. The court also gave a self-defense instruction.

During closing arguments, the State pointed out that Custer had not reported to police McCormick's alleged aggressive actions with the knife. The State also suggested that Custer had 15 months and knowledge of the testimony and evidence against him before he gave his testimony regarding the shooting. Custer did not object to the statements in the State's closing arguments, and he did not move for a mistrial based on the statements.

The jury found Custer guilty of first degree murder, use of a firearm to commit a felony, and being a felon in possession of a firearm. The court sentenced Custer to imprisonment for life for first degree murder, for 20 to 50 years for use of a firearm to commit a felony, and for 10 to 20 years for being a felon in possession of a firearm. The court ordered that the sentences be served consecutively to one another.

When imposing the sentence for first degree murder, the court orally stated at the sentencing hearing that the sentence was "a sentence of not less than a period of your natural life without the possibility of parole." However, the written sentencing order omitted the language regarding the possibility of parole.

In addition, at the sentencing hearing, the court orally stated in connection with both the sentence for use of a firearm to commit a felony and the sentence for being a felon in possession of a firearm that Custer would be given credit for 503 days he had previously served. The written order stated, in a paragraph separate from the paragraphs setting forth the sentences, that Custer "shall receive credit for five hundred three (503) days for time already served."

## B. Direct Appeal

Custer appealed his convictions and sentences to the Nebraska Supreme Court. Custer was represented by the same counsel on appeal as at trial. In his brief, Custer assigned that (1) the state district court erred when it refused to instruct the jury regarding a choice of evils defense to the charge of being a felon in possession of a firearm; (2) there was not sufficient evidence to sustain a conviction for first degree murder because the evidence did not show that he killed McCormick with deliberate and premeditated malice; (3) the State committed prosecutorial misconduct and violated his due process rights when it made certain statements about his post-arrest silence during closing arguments; (4) the state district court erred when, at the sentencing hearing, it orally sentenced him on the first degree murder conviction to life imprisonment "without the possibility of parole"; and (5) the state district court erred by imposing excessive sentences on the convictions for

use of a firearm to commit a felony and being a felon in possession of a firearm. (Filing 9-5 at CM/ECF pp. 9-10; *see also* Filing 9-1 at CM/ECF p. 9.)

In a published opinion filed November 13, 2015, the Nebraska Supreme Court rejected Custer's assignments of error and affirmed his convictions and sentences as modified to correct plain error in the application of the credit for time served.[3] (Filing 9-1 at CM/ECF pp. 10-20.)

## C. Postconviction Action

Custer filed a pro se motion for postconviction relief on May 10, 2016. (Filing 9-12 at CM/ECF pp. 10-27.) On July 11, 2016, Custer filed a pro se supplement, adding arguments and supporting legal authority to the claims in his original postconviction motion. (*Id.* at CM/ECF pp. 39-46.)

Custer alleged that he was denied effective assistance of counsel because trial counsel (1) elicited testimony from Dr. Peter Schilke on cross-examination "on information that was not into [sic] evidence, information that he was not an expert on, [and] information that was substantially detrimental" to Custer's theory of self-defense; (2) failed to object to the foundation of Dr. Schilke's testimony; (3) failed to call Dr. Eischenschmidt to testify regarding the toxicology report he authored; (4) insisted that Fields, a key State witness, "was testifying falsely to information supported by the record and critical to Custer's self-defense claim"; (5) failed to highlight specific facts during cross-examination of Officer James Russell Bush; (6) failed to cross-examine Carolee Ann Vasquez regarding Custer's lack of intent to kill McCormick and his prior possession of the firearm used in the shooting; (7) failed to call Kelly Breen, trial counsel's law partner, as a rebuttal witness to testify

---

[3] The Nebraska Supreme Court stated: "The sentencing order shall be modified to state that Custer is entitled to credit for time served in the amount of 503 days for time already served against the aggregate of the minimum and the aggregate of the maximum sentences of imprisonment for use of a firearm to commit a felony and for being a felon in possession of a firearm." (Filing 9-1 at CM/ECF p. 20.)

about prior consistent statements made by Custer shortly after he was arrested and appointed counsel; (8) failed to object to (a) the prosecutor's statements that Custer had 15 months to fabricate his story and the prosecutor's comparison of Custer's story to that about Santa Claus, (b) Fields' testimony about Custer's criminal history, and (c) Fields' testimony that Custer was not scared of McCormick; (9) failed to submit proper jury instructions on self-defense and a "self-defense option" on the jury verdict form; and (10) failed to request an instruction on provocation to support a conviction on the lesser-included offense of manslaughter. (*Id.* at CM/ECF pp. 11-26, 39-46.) Custer also alleged that, individually or cumulatively, the errors by trial counsel violated his right to effective assistance of counsel. (*Id.* at CM/ECF pp. 26-27.)

The State filed a motion to dismiss Custer's motion for postconviction relief without conducting an evidentiary hearing. (Filing 9-13 at CM/ECF pp. 58-60.) On November 22, 2016, the state district court overruled Custer's motion for postconviction relief and supplement without an evidentiary hearing. (Filing 9-12 at CM/ECF pp. 47-53.)

Custer appealed to the Nebraska Supreme Court, assigning that the state district court erred in denying his motion for postconviction relief, because trial counsel was ineffective when counsel (1) "illicited testimony from Dr. Peter Schilke on information that was not in evidence [and] information that he was not the originating expert on"; (2) "insisted that a key state witness was testifying falsely to information supported by the record and critical to [Custer's] self-defense defense"; (3) cross-examined Officer James Russell Bush; (4) "failed to call rebuttal witness, a fellow law partner, Kelly Breen, to the stand"; (5) "failed to object at critical junctures throughout the entirety of the trial, allowing prosecutors to go unchecked and commit multiple instances of prosecutorial misconduct"; and (6) failed to ensure that "the court provided proper jury instructions, or a proper verdict form to all jurors, and omitted critical instruction on self-defense, assault, terroristic threats and other omissions." (Filing 9-8 at CM/ECF pp. 11-12; *see also* Filing 9-2 at CM/ECF p. 5.) Custer also assigned that the state district court erred in denying his motion for

appointment of counsel. (Filing 9-8 at CM/ECF p. 11; *see also* Filing 9-2 at CM/ECF p. 5.)

In a published opinion (filing 9-2) filed December 1, 2017, the Nebraska Supreme Court concluded that the state district court did not err when it determined that Custer's motion for postconviction relief did not allege facts which constituted a denial of his constitutional rights and accordingly denied Custer's motion. (*Id.* at CM/ECF p. 13.) Thus, the Nebraska Supreme Court affirmed the state district court's decision to deny Custer's postconviction claims without an evidentiary hearing. (*Id.*.)

## D.  Habeas Petition

Custer filed his Petition for Writ of Habeas Corpus in this court on May 22, 2018. (Filing 1.) In response to the Petition, Respondents filed an Answer (filing 14), a Brief (filing 15), and the relevant state court records (filing 9). Respondents argue that Custer's claims are either procedurally defaulted and/or without merit. Custer filed a brief (filing 19) in response to Respondents' Answer, and Respondents filed a reply brief (filing 22). This matter is fully submitted for disposition.

## III.  OVERVIEW OF APPLICABLE LAW

Three strands of federal habeas law intertwine in this case. They are (1) exhaustion and procedural default; (2) the deference that is owed to the state courts when a federal court reviews the factual or legal conclusions set forth in an opinion of a state court; and (3) the standard for evaluating a claim of ineffective assistance of counsel. The court elaborates upon those concepts next so that it may apply them later in a summary fashion as it reviews Custer's claims.

## A.  Exhaustion and Procedural Default

As set forth in 28 U.S.C. § 2254:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The United States Supreme Court has explained the habeas exhaustion requirement as follows:

Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

A state prisoner must therefore present the substance of each federal constitutional claim to the state courts before seeking federal habeas corpus relief. In Nebraska, "one complete round" ordinarily means that each § 2254 claim must have been presented to the trial court, and then in an appeal to either the Nebraska Supreme Court directly[4] or to the Nebraska Court of Appeals, and then in a petition for further review to the Nebraska Supreme Court if the Court of Appeals rules against the petitioner. *See Akins v. Kenney*, 410 F.3d 451, 454-55 (8th Cir. 2005).

---

[4] Where a life sentence has been imposed in a criminal case, the appeal goes directly to the Nebraska Supreme Court. Neb. Rev. Stat. § 24-1106 (West).

14

"In order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." *Carney v. Fabian*, 487 F.3d 1094, 1096 (8th Cir. 2007) (internal citation and quotation omitted). Although the language need not be identical, "[p]resenting a claim that is merely similar to the federal habeas claim is not sufficient to satisfy the fairly presented requirement." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999). In contrast, "[a] claim has been fairly presented when a petitioner has properly raised the 'same factual grounds and legal theories' in the state courts which he is attempting to raise in his federal habeas petition." *Wemark v. Iowa*, 322 F.3d 1018, 1021 (8th Cir. 2003) (citation omitted).

Where "no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.'" *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)).

To be precise, a federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Also, a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims on the merits notwithstanding the existence of a procedural bar to relief. *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). To invoke the actual innocence exception, a petitioner "must show that in light of all the evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty

beyond a reasonable doubt.'" *Jennings v. United States*, 696 F.3d 759, 764-65 (8th Cir. 2012) (quoting *Schlup v. Delo*, 513 U.S. 298, 327, (1995)). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.* (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

## B. Nebraska Law Relevant to Procedural Default

Under Nebraska law, you don't get two bites of the postconviction apple; that is, "[a]n appellate court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion." *State v. Ortiz*, 670 N.W.2d 788, 792 (Neb. 2003). Additionally, "[a] motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal." *Hall v. State*, 646 N.W.2d 572, 579 (Neb. 2002). *See also State v. Thorpe*, 858 N.W.2d 880, 887 (Neb. 2015) ("A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased.").

Moreover, a person seeking postconviction relief must present his or her claim to the district court or the Nebraska appellate courts will not consider the claim on appeal. *State v. Deckard*, 722 N.W.2d 55, 63 (Neb. 2006) (denying postconviction relief in a murder case and stating: "An appellate court will not consider as an assignment of error a question not presented to the district court for disposition through a defendant's motion for postconviction relief.") Similarly, on appeal, the appealing party must both assign the specific error and specifically argue that error in the brief. Otherwise the claim is defaulted under Nebraska law. *State v. Henry*, 875 N.W.2d 374, 407 (Neb. 2016) (stating an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court).

Note also that Nebraska has a statute of limitations for bringing postconviction actions that is similar to federal law. It reads:

16

(4) A one-year period of limitation shall apply to the filing of a verified motion for postconviction relief. The one-year limitation period shall run from the later of:

>       (a) The date the judgment of conviction became final by the conclusion of a direct appeal or the expiration of the time for filing a direct appeal;

>       (b) The date on which the factual predicate of the constitutional claim or claims alleged could have been discovered through the exercise of due diligence;

>       (c) The date on which an impediment created by state action, in violation of the Constitution of the United States or the Constitution of Nebraska or any law of this state, is removed, if the prisoner was prevented from filing a verified motion by such state action;

>       (d) The date on which a constitutional claim asserted was initially recognized by the Supreme Court of the United States or the Nebraska Supreme Court, if the newly recognized right has been made applicable retroactively to cases on postconviction collateral review; or

>       (e) August 27, 2011.

Neb. Rev. Stat. § 29-3001(4) (West).


## C.  Deferential Standard Under 28 U.S.C. § 2254(d)

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the law and the facts. *See* 28 U.S.C. § 2254(d). Section 2254(d)(1) states that a federal court may grant a writ of habeas corpus if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As explained by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362 (2000), a state

court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. *Id.* at 405-06. Further, "it is not enough for [the court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006).

With regard to the deference owed to factual findings of a state court's decision, section 2254(d)(2) states that a federal court may grant a writ of habeas corpus if a state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As the Supreme Court noted, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The deference due state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.*

However, this high degree of deference only applies where a claim has been adjudicated on the merits by the state court. *See Brown v. Luebbers*, 371 F.3d 458, 460 (8th Cir. 2004) ("[A]s the language of the statute makes clear, there is a condition precedent that must be satisfied before we can apply the deferential AEDPA [Antiterrorism and Effective Death Penalty Act] standard to [the petitioner's] claim. The claim must have been 'adjudicated on the merits' in state court.").

The Eighth Circuit clarified what it means for a claim to be adjudicated on the merits, finding that:

> AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court. Accordingly, the postconviction trial court's discussion of counsel's performance—combined with its express determination that the ineffective-assistance claim as a whole lacked merit—plainly suffices as an adjudication on the merits under AEDPA.

*Worthington v. Roper*, 631 F.3d 487, 496-97 (8th Cir. 2011) (internal quotation marks and citations omitted).

The court also determined that a federal court reviewing a habeas claim under AEDPA must "look through" the state court opinions and "apply AEDPA review to the 'last reasoned decision' of the state courts." *Id.* at 497. A district court should do "so regardless of whether the affirmance was reasoned as to some issues or was a summary denial of all claims." *Id.*

## D.  The Especially Deferential *Strickland* Standard

When a petitioner asserts an ineffective assistance of counsel claim, the two-pronged standard of *Strickland v. Washington*, 466 U.S. 668 (1984), must be applied. The standard is very hard for offenders to satisfy.

*Strickland* requires that the petitioner demonstrate both that his counsel's performance was deficient, and that such deficient performance prejudiced the petitioner's defense. *Id.* at 687. The first prong of the *Strickland* test requires that the petitioner demonstrate that his attorney failed to provide reasonably effective assistance. *Id.* at 687-88. In conducting such a review, the courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

The second prong requires the petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Further, as set forth in *Strickland*, counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" in a later habeas corpus action. *Id.* at 690.

Additionally, the Supreme Court has emphasized that the deference due the state courts applies with special vigor to decisions involving ineffective assistance of counsel claims. *Knowles v. Mirzayance*, 556 U.S. 111 (2009). In *Knowles*, the Justices stressed that under the *Strickland* standard, the state courts have a great deal of "latitude" and "leeway," which presents a "substantially higher threshold" for a federal habeas petitioner to overcome. As stated in *Knowles*:

> The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Id.* at 123 (internal quotation marks and citations omitted).

*Strickland* applies equally to appellate counsel, and appellate counsel is entitled to the "benefit of the doubt." *Woods v. Etherton*, 136 S. Ct. 1149, 1153 (2016). To demonstrate prejudice on account of appellate counsel's failure to raise a claim on appeal, a petitioner must show a "reasonable probability that an appeal of [the] issue would have been successful and that the result of the appeal would thereby have been different." *Pryor v. Norris*, 103 F.3d 710, 714 (8th Cir. 1997). The petitioner must show more than that the alleged error had some conceivable effect on the outcome of the proceeding. *Id.* at 713. "'Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have

influenced the outcome undermines the reliability of the result of the proceeding.'" *Id.* (quoting *Strickland*, 466 U.S. at 693).

## IV. DISCUSSION

### A. Claim One

Claim One consists of multiple allegations of ineffective assistance of trial counsel.

At the outset, the court notes that some of Custer's ineffective assistance of trial counsel claims have been procedurally defaulted. In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court held that "[i]nadequate assistance of counsel [or the absence of counsel] at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* at 9. Even assuming *Martinez* applies to federal habeas corpus cases arising from Nebraska convictions,[5] the court need not address whether *Martinez* applies to excuse the procedural default of any of Custer's ineffective assistance of trial counsel claims because the court has alternatively found that the defaulted claims fail on their merits.

The court also notes, as a general matter, that the Nebraska Supreme Court properly set forth the *Strickland* standards before it addressed the ineffective assistance of counsel claims on postconviction appeal. (Filing 9-2 at CM/ECF p. 6.)

_____

[5] The court does not believe that *Martinez* or *Trevino v. Thaler*, 569 U.S. 413 (2013), applies in Nebraska. *See Kidder v. Frakes*, 400 F. Supp. 3d 809, 818 n.4 (D. Neb. 2019). This is because Nebraska demands that ineffective assistance of trial counsel claims be raised on direct appeal when appellate counsel is different than trial counsel. *State v. Filholm*, 848 N.W.2d 571, 576 (Neb. 2014).

### 1. Subpart (1)

In Claim One, Subpart (1), Custer claims that he was denied effective assistance of counsel because trial counsel elicited testimony from Dr. Peter Schilke regarding information in a toxicology report authored by Dr. Eischenschmidt. (Filing 1 at CM/ECF pp. 17, 19.)

The Nebraska Supreme Court considered and rejected this claim on postconviction appeal as follows:

> Custer argues that the district court erred in denying an evidentiary hearing on the ground that counsel rendered ineffective assistance when cross-examining Dr. Peter Schilke. Schilke was a witness for the State and a pathologist. Schilke performed McCormick's autopsy, during which he obtained fluids for a toxicology panel. Those samples were sent to a toxicologist for testing.

> Custer takes issue with the following question posed by counsel during cross-examination of Schilke:

>> Q. . . . [I]n [the toxicologist's] findings, he said that blood levels of 200 ng to 600 ng had been reported in methamphetamine abusers who exhibited violent and irrational behavior. Now I realize [McCormick's] level wasn't as high as 200 to 600 but what I guess I am asking you is it, in your experience that methamphetamine users can exhibit violent and irrational behavior?

>> A. Sure, that has been reported.

> Custer argues that counsel erred in drawing the jury's attention to the fact that the level of methamphetamine in McCormick's system was lower than levels that had reportedly caused "violent and irrational behavior."

> Custer relied on a theory of self-defense at trial. The testimony elicited by counsel demonstrated that McCormick had levels of

methamphetamine in his system. Schilke's testimony supported the conclusion that levels did not have to be as high as "200 ng to 600 ng" in order to cause "methamphetamine users [to] exhibit violent and irrational behavior." That McCormick could have been violent and irrational despite the relatively low level of methamphetamine in his system was entirely consistent with, and helpful to, Custer's claim of self-defense.

We agree with the district court that counsel's performance was not deficient and therefore find no merit to this assignment of error.

(Filing 9-2 at CM/ECF pp. 6-7.)

The court finds that the Nebraska Supreme Court reasonably applied *Strickland* in concluding that trial counsel's cross-examination of Dr. Schilke did not constitute deficient performance. Indeed, the testimony trial counsel elicited from Dr. Schilke on cross-examination supported Custer's self-defense theory that McCormick was acting irrationally and violent at the time of the confrontation despite the relatively low level of methamphetamine in his system. Custer simply fails to demonstrate how trial counsel rendered ineffective assistance by eliciting testimony that was favorable to Custer's self-defense theory. Thus, applying the deferential standards required by both *Strickland* and 28 U.S.C. § 2254(d), the court finds nothing to indicate that the Nebraska Supreme Court's ruling was based on an unreasonable determination of the facts in light of the evidence, or was contrary to, or involved an unreasonable application of, clearly established federal law.

## 2. Subparts (2) and (3)

In Claim One, Subpart (2), Custer asserts that he was denied effective assistance of counsel because trial counsel failed to object to the foundation of Dr. Schilke's testimony. (Filing 1 at CM/ECF pp. 17, 19.) Relatedly, in Claim One, Subpart (3), Custer alleges that he was denied effective assistance of counsel because trial counsel failed to call Dr. Eischenschmidt to testify regarding the toxicology report he authored. (*Id.*)

Custer raised these claims in his postconviction motion and/or supplement (*see* filing 9-12 at CM/ECF pp. 11-13, 39-40, 45-46), but he did not assign them as errors in his brief to the Nebraska Supreme Court on postconviction appeal. (*See* filing 9-8 at CM/ECF pp. 11-12). Instead, Custer assigned as error and argued the related claim discussed above in Claim One, Subpart (1)—that trial counsel was ineffective for eliciting testimony from Dr. Schilke on information that was not in evidence and information on which Dr. Schilke was not the originating expert. (*Id.* at CM/ECF p. 11.) The Nebraska Supreme Court considers only errors that are both specifically assigned and specifically argued in the brief. *See State v. Filholm*, 848 N.W.2d 571, 578 (Neb. 2014) ("An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court."). Thus, Custer did not properly present the claims in Claim One, Subparts (2) and (3), in his brief to the Nebraska Supreme Court, and he is procedurally barred from raising them in what would be a successive motion for postconviction relief. *See State v. Sims*, 761 N.W.2d 527, 533 (Neb. 2009) ("[A]n appellate court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion"); *Ortiz*, 670 N.W.2d at 792 (same). Accordingly, Claim One, Subparts (2) and (3), are procedurally defaulted. In the alternative, as set forth below, even if Custer had not procedurally defaulted Claim One, Subparts (2) and (3), or if the procedural default is somehow excused, the court finds that these claims are without merit.

As Respondents point out, Custer did *argue* in his original brief to the Nebraska Supreme Court that he was entitled to confront Dr. Eischenschmidt, and then in his reply brief that trial counsel should have subpoenaed Dr. Eischenschmidt to testify, arguments which correspond to Claim One, Subpart (3). (Filing 15 at CM/ECF p. 23; *see* also Filing 9-8 at CM/ECF p. 21; Filing 9-10 at CM/ECF pp. 10-11.) Respondents also acknowledge that Claim One, Subpart (1), "could be restated as ineffective assistance of trial counsel for eliciting testimony from Dr. Schilke that lacked foundation." (Filing 15 at CM/ECF p. 23.) Thus, to the extent Custer's assigned error and argument to the Nebraska Supreme Court in Claim One, Subpart

(1), encompassed the errors and arguments in Claim One, Subparts (2) and (3), the court finds that Subparts (2) and (3) fail on the merits for the reasons stated in Claim One, Subpart (1), and because Custer cannot demonstrate that he was prejudiced by trial counsel's alleged deficiencies.

As previously set forth in Claim One, Subpart (1), the Nebraska Supreme Court determined that Dr. Schilke's testimony supported Custer's self-defense theory that McCormick was acting irrationally and violently at or around the time of his death because of his consumption of methamphetamine, regardless of the levels in his system. Thus, trial counsel's decision not to object to the foundation of Dr. Schilke's testimony, which was consistent with Custer's self-defense theory, was reasonable trial strategy and did not prejudice Custer's defense. Custer has also failed to establish that trial counsel's decision not to call Dr. Eischenschmidt to testify about the toxicology report constituted ineffective assistance. The testimony that Custer argues Dr. Eischenschmidt would have provided in support of his claim of self-defense—that McCormick's methamphetamine use, in any amount, could have caused him to act violently and irrationally—is the same testimony elicited from Dr. Schilke. As the state district court found in its order denying postconviction relief, "[w]hether the testimony came from Dr. Eischenschmidt or Dr. Schilke, the intent of the evidence was to demonstrate that Mr. McCormick could have (was) acting irrationally or violently at or near the time of his death," which "was consistent with the defense offered at the trial." (Filing No. 9-12 at CM/ECF p. 49.) Applying the deferential standards required by both *Strickland* and 28 U.S.C. § 2254(d), the court finds nothing to indicate that the state district court's ruling was based on an unreasonable determination of the facts in light of the evidence, or was contrary to, or involved an unreasonable application of, clearly established federal law. Indeed, Custer cannot establish prejudice where the proposed testimony of Dr. Eischenschmidt would have been substantially the same as Dr. Schilke's testimony and would have been cumulative evidence that Custer acted in self-defense. *See Wong v. Belmontes*, 558 U.S. 15, 22-23 (2009) (noting a defendant does not suffer prejudice when the evidence is merely cumulative). The jury clearly rejected

Custer's theory of self-defense, finding him guilty of first degree murder. Therefore, the court alternatively denies Claim One, Subparts (2) and (3), as without merit.[6]

### 3. Subpart (4)

In Claim One, Subpart (4), Custer asserts that he was denied effective assistance of counsel because trial counsel failed to provide proper jury instructions on self-defense, assault, and terroristic threats. (Filing 1 at CM/ECF pp. 3, 17.)

In his postconviction motion, Custer alleged that trial counsel failed to submit proper jury instructions on self-defense and a "self-defense option" on the jury verdict form. (Filing 9-12 at CM/ECF pp. 25-26.) In his supplement, Custer further alleged that trial counsel was ineffective for failing to request an instruction on provocation to support a conviction on the lesser-included offense of manslaughter because he only acted in response to McCormick's attempted assault and terroristic threats. (Id. at CM/ECF pp. 44-45.) In his postconviction appeal brief to the Nebraska Supreme Court, Custer assigned as error that trial counsel was ineffective for failing to ensure that "the court provided proper jury instructions, or a proper verdict form to all jurors, and omitted critical instruction on self-defense, assault, terroristic threats and other omissions." (Filing 9-8 at CM/ECF p. 3.) But the only issues that were both assigned and argued in Custer's original brief and alleged in

---

[6] The court understands the basis of Custer's ineffective assistance of trial counsel claim is premised on the argument that the toxicology results of the autopsy report were "testimonial," and therefore, Custer's Confrontation Clause rights were violated when Dr. Schilke testified as to the toxicology results, which he did not author, and Dr. Eischenschmidt, the author of the toxicology report, was not called as a witness at trial. (Filing 1 at CM/ECF pp. 17, 19; Filing 19 at CM/ECF pp. 5-6.) (Filing 9-8 at CM/ECF p. 21; Filing 9-10 at CM/ECF p. 11.) Even if the toxicology results were "testimonial" and the circumstances amounted to a Confrontation Clause violation, Custer has not made the requisite showing of prejudice for the reasons discussed above—namely, Dr. Schilke's testimony supported Custer's self-defense theory and Dr. Eischenschmidt's proposed testimony would have been the same as Dr. Schilke's and cumulative.

his postconviction motion and/or supplement were that trial counsel was ineffective for failing to submit a proper jury instruction on self-defense and to provide a "self-defense option" on the jury verdict form. (*Id.* at CM/ECF p. 34; *see also* Filing 9-2 at CM/ECF p. 12.) The Nebraska Supreme Court addressed the self-defense jury instruction arguments as follows:

> We find that the jury was instructed on Custer's claim of self-defense. Jury instruction No. 4 states, under the elements of first degree murder, "[t]hat the Defendant did not do so in self-defense." Similarly, this phrase is also listed under the elements of second degree murder and manslaughter.
>
> The language of jury instruction No. 10 comes directly from NJI2d Crim. 7.3. Custer contends that the language is improper in light of *State v. Miller*. But Custer fails to allege how the instruction should have read in order for it to be "proper." Therefore, we find that the above jury instruction properly instructed the jury on self-defense.
>
> Second, we find that "a self-defense option" was clearly explained in the jury instructions. As we stated, jury instruction No. 10 defines self-defense under the circumstances of this case. Jury instruction No. 4 further states that the jury must find Custer not guilty of count I if "you find the State has failed to prove beyond a reasonable doubt any one or more of the elements." Because "[t]hat the Defendant did not do so in self-defense" was one of the elements of first degree murder, second degree murder, and manslaughter, it necessarily follows that if the jury found the State had not proved that element, the jury would have to find Custer not guilty of both counts I and II. Therefore, the jury instructions provided adequate explanation and opportunity for the jury to find that Custer acted in self-defense.
>
> . . . .
>
> There is no merit to this assignment of error.

(Filing 9-2 at CM/ECF p. 12 (footnotes omitted).)

As in the state court postconviction proceeding, Custer fails to allege in his habeas petition how the self-defense instruction should have read for it to be "proper." Indeed, the state district court noted that the jury instruction given on self-defense was "taken essentially verbatim from the Nebraska Jury Instructions." (Filing 9-12 at CM/ECF p. 52; *see also* Filing 9-11 at CM/ECF p. 30.) Applying the deferential standard required by 28 U.S.C. § 2254(d), the court finds nothing to indicate that the Nebraska Supreme Court's ruling was based on an unreasonable determination of the facts in light of the evidence, or was contrary to, or involved an unreasonable application of, clearly established federal law.

Custer's claims that he was denied effective assistance of counsel because trial counsel failed to provide proper jury instructions on assault and terroristic threats are procedurally defaulted. Custer assigned these claims as error, but did not argue them, in his original postconviction appellate brief to the Nebraska Supreme Court. He did add an argument in his reply brief on the omission of jury instructions for the "lesser-included" offenses of assault and terroristic threats, as acts he committed, rather than McCormick. (*See* Filing 9-10 at CM/ECF pp. 18-23.) But the Nebraska Supreme Court will only consider claims assigned and argued in an original appellate brief. *See State v. Newman*, 916 N.W.2d 393, 403 (Neb. 2018) ("An assignment of error raised for the first time in a reply brief is untimely and will not be considered by the court. We therefore limit our analysis to the assignments made and argued in Newman's original appellate brief."). Thus, Custer did not properly present these claims to the Nebraska Supreme Court, and he is procedurally barred from raising them in what would be a successive motion for postconviction relief. *See Sims*, 761 N.W.2d at 533; *Ortiz*, 670 N.W.2d at 792. In the alternative, as discussed below, even if Custer had not procedurally defaulted these claims, or if the procedural default is somehow excused, the court finds that they are without merit.

To the extent Custer argues that the lack of these instructions prevented the jury from finding him guilty of manslaughter, the court disagrees. A defendant, like Custer, who is "convicted of first degree murder under a step instruction cannot be

prejudiced by any error in the instructions on second degree murder or manslaughter because under the step instruction, the jury would not have reached those levels of homicide." *Alarcon-Chavez v. Nebraska*, No. 8:17CV345, 2018 WL 4701309, at *12-13 (D. Neb. Oct. 1, 2018), *appeal dismissed*, No. 18-3511, 2019 WL 2273653 (8th Cir. Apr. 2, 2019); *Robinson v. Sabatka-Rine*, No. 8:13CV197, 2016 WL 5254825, at *14 (D. Neb. Sept. 22, 2016) (quoting *State v. Alarcon-Chavez*, 821 N.W.2d 359, 368 (Neb. 2012) (finding the defendant was not prejudiced and his substantial rights were not affected by the manslaughter instruction)). (*See* Filing 9-11 at CM/ECF pp. 20-22.) Furthermore, because the lesser included offenses of second degree murder and manslaughter were submitted to the jury, and the jury nonetheless convicted Custer of the greater offense of first degree murder, there can have been no prejudice to Custer from the failure to submit any additional and even lesser offenses. *See Johnston v. Bowersox*, 119 F. Supp. 2d 971, 987 (E.D. Mo. 2000), *aff'd sub nom. Johnston v. Luebbers*, 288 F.3d 1048 (8th Cir. 2002); *cf. Pitts v. Lockhart*, 911 F.2d 109, 112 (8th Cir. 1990), *cert. denied*, 501 U.S. 1253 (1991) ("[F]ailure of the trial court to give a [lesser included offense] instruction [does] not rise to the level of constitutional error."). As such, Custer's claimed instructional errors, and any ineffective assistance of counsel claim based upon them, are without merit.

### 4. Subpart (5)

In Claim One, Subpart (5), Custer contends that he was denied effective assistance of counsel because trial counsel failed to object to prosecutorial misconduct and/or ask for a mistrial. (Filing 1 at CM/ECF pp. 17, 26-27.) Custer identifies the following instances of prosecutorial misconduct: (1) arguing Custer's post-arrest silence during closing arguments;[7] (2) "brow-beating" Custer during

---

[7] Specifically, Custer points to the prosecutor's argument that Custer had 15 months to "come up with his self-defense claim," which he failed to report to law enforcement. (Filing 1 at CM/ECF p. 26.) The merits of the underlying prosecutorial misconduct claim related to this argument is discussed below in Claim Five, Subpart (1).

cross-examination with questions already asked and answered about having had 15 months to review the evidence; (3) introducing a religious theme during closing argument; and (4) eliciting Billy Fields' testimony that Custer was not scared of the victim. (*Id.* at CM/ECF pp. 26-27.)

### a. "Brow-Beating" During Cross-Examination

Although Custer arguably raised the "brow-beating" during cross-examination allegation in his postconviction motion (*see* filing 9-12 at CM/ECF pp. 22-24), the state district court did not address it. Custer again raised it in his postconviction appeal brief to the Nebraska Supreme Court (*see* filing 9-8 at CM/ECF pp. 28, 30-31), but the court did not address it as a separate issue. The Nebraska Supreme Court likely construed this allegation in the context of Custer's related argument (the merits of which will be discussed below) that trial counsel was ineffective for failing to object to the prosecutor's statement in closing that Custer could "accurately testify in relation to the evidence . . . because he had had 15 months to review the evidence, discovery, and hear all the testimony given in the case." (*See* Filing 9-2 at CM/ECF p. 9.) Because the Nebraska state courts did not address Custer's claim that trial counsel was ineffective for failing to object to the prosecutor "brow-beating" Custer during cross-examination, the court reviews this claim de novo. *See Worthington*, 631 F.3d at 495.

The use of inflammatory statements and the badgering of a defendant on cross examination may constitute prosecutorial misconduct. *Berger v. United States*, 295 U.S. 78, 84 (1935). In the *Berger* case, however, the Supreme Court found that the prosecutor had misstated facts to witnesses, assumed facts not in evidence, and made up witness statements during cross-examination. *Id.* at 84. The Court found the prosecutor had acted in such an "indecorous and improper manner" in questioning the witnesses that the only remedy was likely "the granting of a mistrial." *Id.* at 85.

Similar conduct by the prosecutor did not occur here. On cross-examination of Custer, the prosecutor asked whether he thought Leal and Wright were lying about their recollections of the shooting. The following colloquy ensued:

> Q.  Okay, they perceived it, differently, maybe, all right. Now, you would agree with me that Syrus Leal and Josh Wright perceived it differently or are lying about it, correct, one of the two, one or the other?
>
> A.  I do not understand the question.
>
> Q.  I mean they are either they either received [sic] or wrong or they are lying, correct?
>
> A.  Correct.
>
> A.  And you don't, have to say they are lying, I will say that, they are lying or they perceived differently, right?
>
> A.  Okay.
>
> Q.  And they had approximately, these two individuals had approximately a couple of minutes to get their stories straight?
>
> A.  I am not sure how long.
>
> Q.  All right, and you, sir, have had 15 months to get, your story straight, something like that?
>
> A.  I have been sitting there about, that, yeah.
>
> Q.  You have had the opportunity to sit through all of the trial and listen to all of the testimony?
>
> A.  Yes, sir.
>
> Q.  So, you have had 15 months, you have heard from all of the witnesses, you've got all of the evidence in this case, I mean all of the discovery, right?

31

A.  I believe so.

Q.  These two gentleman who had—they were rather similar stories, right? You would agree to that?

A.  To a degree, yes.

Q.  And these two gentleman who just saw their friend get shot, it looked like he was going to die, they had just a couple of minutes but they got their stories remarkably similar, right?

A.  (No audible response had.)

. . . .

Q.  All right, so these two individuals, let's just say they are lying, so they had a couple of minutes after their friend just got shot and looks like he is going to die, and they get their story together, right? I mean you have 15 months and you sit through a whole trial and they are lying and you're not, I mean that is what you want the jury to believe?

A.  No, that is not—I want them to look at the forensics and make their opinion. That is what I want.

(Filing 9-18 at CM/ECF pp. 124-26; *see also* Filing 9-12 at CM/ECF pp. 22-23.)

The court finds that this line of inquiry during cross-examination did not amount to "brow-beating" or badgering Custer, let alone reach the level of misconduct as exemplified by *Berger*, 295 U.S. at 84. Considered in context, it is clear the prosecutor was asking legitimate questions to attack Custer's credibility. Specifically, the prosecutor was highlighting that Custer had 15 months to prepare his testimony while Leal and Wright had only a short amount of time to prepare their statements to law enforcement. "If a defendant takes the stand, his credibility is placed in issue, and the Government is entitled to attack it by cross-examination." *United States v. Wallace*, 722 F.2d 415, 416 (8th Cir. 1983). Accordingly, an objection would not have been meritorious because the line of questioning was a permissible attack on Custer's credibility. Because an objection based on badgering

would have been without merit, trial counsel cannot be found to have acted ineffectively in this regard. *See Gray v. Bowersox*, 281 F.3d 749, 756 n.3 (8th Cir. 2002) ("[B]ecause the underlying objection would have been without merit, a claim of ineffective assistance is not viable."). Furthermore, Custer cannot demonstrate prejudice from this line of questioning when the jury heard the prosecutor argue the same during closing, and—as discussed directly below and in Claim Five, Subpart (1)—the Nebraska Supreme Court determined that that argument was not improper and did not constitute prosecutorial misconduct. Thus, after careful de novo review, the court finds that Custer is not entitled to habeas relief on his allegation that trial counsel was ineffective for failing to object to the prosecutor's cross-examination of Custer.

### b. Remaining Allegations

The Nebraska Supreme Court addressed Custer's remaining allegations concerning trial counsel's failure to object to instances of prosecutorial misconduct. The Nebraska Supreme Court wrote:

> Custer argues that counsel was ineffective for failing to object to (1) a statement made by the prosecutor in closing argument that Custer could "accurately testify in relation to the evidence . . . because he had had 15 months to review the evidence, discovery, and hear all the testimony given in the case"; (2) an analogy made by the prosecutor in closing statements; . . . and (5) testimony from Fields that Custer was not scared of McCormick. The district court held that counsel's failure to object in each of these instances was not deficient and that Custer had not shown he was prejudiced.
>
> First, Custer contends that the prosecutor's statements in closing arguments were improper when the prosecutor stated that Custer could "accurately testify in relation to the evidence . . . because he had had 15 months to review the evidence." We have already addressed this allegation in our opinion in Custer's direct appeal. We held that

> the State's comments [made during closing arguments referencing the prosecutor's statements] regarding the amount of time [Custer] had to prepare his testimony for trial and the State's comments highlighting [Custer's] failure to report the shooting and McCormick's alleged aggressive actions to the police . . . were not improper and did not constitute prosecutorial misconduct.

We will not revisit the matter here. There is no merit to this assertion.

Custer next contends that counsel was ineffective for failing to object to the prosecutor's closing argument when the prosecutor relied on an analogy that Custer's account of the circumstances surrounding the shooting were a "lie" and a "fantasy," much like the story about Santa Claus that he told his son at Christmas. In order for his son to believe in Santa Claus, the prosecutor explained, his son would have to "ignore the evidence." The prosecutor then stated that Custer's account "doesn't comport with reality. He is asking you to ignore the evidence. It does not fit common sense." Custer contends that the analogy was "religiously infused," thus "playing to the passions and prejudices of the jury."

The Nebraska Rules of Professional Conduct set forth that a lawyer shall not, in trial, "state a personal opinion as to the . . . credibility of a witness . . . or the guilt or innocence of an accused." But we have explained that "when a prosecutor's comments rest on reasonably drawn inferences from the evidence, the prosecutor is permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence and to highlight the relative believability of witnesses for the State and the defense." Thus, in cases where a prosecutor comments on the theory of defense, the defendant's veracity, or the defendant's guilt, the prosecutor crosses the line into misconduct only if the prosecutor's comments are expressions of the prosecutor's personal beliefs rather than a summation of the evidence. In assessing whether a prosecutor's statements were misconduct, we "look[ ] at the entire context of the language used to determine whether the prosecutor was expressing a personal opinion or merely submitting to the jury a conclusion that the prosecutor is arguing can be drawn from the evidence."

Custer mischaracterizes the prosecutor's analogy. The prosecutor's statements were not "religiously infused." Instead, looking at the entire context of the language, the statement to which Custer takes issue established an inference that the jury would have to "ignore the evidence" to believe Custer's account. Thus, the prosecutor was arguing that a conclusion could be drawn from the evidence that Custer lied in his testimony. Because the prosecutor's analogy was not an expression of a personal opinion in support of religion, or an effort to inflame the jurors' prejudices or excite their passions against the accused, we find no error in the prosecutor's comments.

. . . .

In addition, Custer contends that counsel was ineffective for failing to object to an answer made by Fields, which Custer contends was hearsay. Custer takes issue with the following inquiry in the State's direct examination of Fields: "Q: How about, to your knowledge did [Custer] ever indicate that he was scared of [McCormick] to you? [Fields]: No. Q: He didn't indicate that [to] you? A: No." Custer claims that counsel should have objected to Fields' answer as hearsay, because Fields "is unqualified to know the thoughts and fears of [Custer]."

Custer mischaracterizes the above line of inquiry. The State asked whether Custer had indicated to Fields that he was scared of McCormick. A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. The question concerns whether Custer had indicated anything to Fields. This is a fact within Fields' personal knowledge of the matter and, as such, was admissible. Counsel was not deficient for failing to object.

There is no merit to this assignment of error.

(Filing 9-2 at CM/ECF pp. 9-12 (footnotes omitted).)[8]

---

[8] This same analysis applies to establish that trial counsel was not ineffective for failing to request a mistrial.

In short, the Nebraska Supreme Court determined that the underlying objections were without merit. Based on that finding, it concluded that trial counsel was not ineffective for failing to object. *See Gray*, 281 F.3d at 756 n.3. This ruling was neither based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, nor was it contrary to, or an unreasonable application of, *Strickland* or other federal law. Accordingly, Custer is not entitled to habeas relief on the remaining allegations of Claim One, Subpart (5).

### 5. Subpart (6)

In Claim One, Subpart (6), Custer asserts that he was denied effective assistance of counsel because trial counsel insisted that a key state witness, Billy Fields, was testifying falsely to information supported by the record and critical to Custer's self-defense claim. (Filing 1 at CM/ECF pp. 18, 32.)

The Nebraska Supreme Court considered and rejected the merits of this claim on postconviction appeal. The court wrote:

> Custer argues that counsel was ineffective in advising him to discredit Billy Fields' testimony, which Custer claims ultimately led Custer to change Custer's testimony.
>
> Custer testified that a few days before the shooting, McCormick came to an apartment in which Custer was staying and demanded that Custer repay the money that McCormick had loaned him. Custer testified that during this exchange, neither he nor McCormick threatened each other with a knife.
>
> At trial, however, Fields testified on cross-examination that while Fields did not see anything, Custer told him after the exchange that "he had pulled a knife on [McCormick] and that [McCormick] had pulled one back." On cross-examination, Fields initially claimed that he had explained this account in his deposition, but when pressed by Custer's counsel, Fields was unable to find this testimony in the transcript of that deposition. Counsel then asked Fields: "[I]t's safe to say the first time

36

you ever said that was yesterday in court, correct?" Fields agreed. But on redirect, the State presented Fields with his deposition and requested that he read certain lines the State had identified in which Fields had stated that Custer and McCormick pulled knives on each other. In addition, Custer's testimony at trial of the same incident contradicted Fields' testimony.

Assuming that counsel was ineffective in his attempt to attack Fields' credibility, Custer has not shown that he was prejudiced. The incident in which McCormick allegedly pulled a knife on Custer occurred several days before the shooting and did not provide a basis for the jury to find, as Custer contends, that Custer feared for his life at the time of the shooting. Indeed, evidence at trial showed that Custer and McCormick had exchanged threats the night of the shooting, at which point Custer drove over to Syrus Leal's house, where he knew McCormick was, to confront McCormick. Therefore, even if counsel was deficient in this line of questioning, Custer has not shown that he was prejudiced by counsel's performance. There is no merit to Custer's assertion that counsel was ineffective.

(Filing 9-2 at CM/ECF p. 7.)

The court finds that the Nebraska Supreme Court reasonably applied *Strickland*'s prejudice prong in concluding that trial counsel's cross-examination of Fields did not constitute ineffective assistance. Thus, applying the deferential standards required by both *Strickland* and 28 U.S.C. § 2254(d), the court finds nothing to indicate that the Nebraska Supreme Court's ruling was based on an unreasonable determination of the facts in light of the evidence, or was contrary to, or involved an unreasonable application of, clearly established federal law. Accordingly, Claim One, Subpart (6), is denied.

### 6. Subpart (7)

In Claim One, Subpart (7), Custer claims that he was denied effective assistance of counsel because trial counsel refused to call trial counsel's law partner, Kelly Breen, as a witness to testify about prior consistent statements made by Custer

shortly after he was arrested and appointed counsel. (Filing 1 at CM/ECF pp. 18, 32.)

The Nebraska Supreme Court addressed this claim on postconviction appeal as follows:

> Custer contends that his counsel was ineffective for failing to call Breen, a lawyer from the Commission on Public Advocacy who was first appointed as Custer's counsel, because Breen "had been told the entire version of . . . Custer's side of the incidents leading up to the shooting death of . . . McCormick, within only a few days of the shooting" in order "to confirm the version of events as told by [Custer] at trial." Custer argues that Breen could have testified that Custer "maintained from the beginning that he acted in self-defense" and that Custer "testified differently at the behest of" counsel due to "improper legal advice."
>
> Fields testified on direct examination that Custer had told him shortly after the shooting that McCormick "had come running at [Custer] with something in his hand," so Custer shot at him. Fields testified again on direct examination that Custer told him that McCormick "had rushed [Custer] and that [McCormick] had something in his hand."
>
> Custer has not identified how Breen's testimony of Custer's account following the shooting and immediately prior to trial would have differed from the account that Custer relayed to Fields shortly after the shooting and prior to trial. Custer has only alleged that Breen would "underscore" that Custer "testified [at trial] differently at the behest of his unethical lawyer . . . whom [sic] gave him improper legal advice." Custer has not alleged what Breen would testify to in support of Custer's claim that he changed his testimony due to counsel's "improper legal advice." Custer alleged only mere conclusions of law and has not alleged sufficient facts to support his allegation of ineffective assistance of counsel. There is no merit to Custer's arguments on appeal.

(Filing 9-2 at CM/ECF pp. 8-9 (footnotes omitted).)

38

The Nebraska Supreme Court's resolution of the claim was based on a firmly established state procedural rule. That is, in Nebraska, if a postconviction motion alleges only conclusions of fact or law, the court is not required to grant an evidentiary hearing. *State v. Dragon*, 843 N.W.2d 618, 623 (Neb. 2014); *see also State v. Abdullah*, 853 N.W.2d 858, 867 (Neb. 2014) (a petitioner is required to specifically allege in a motion for postconviction relief what the testimony of potential witnesses would have been if they had been called in order to avoid dismissal without an evidentiary hearing). Therefore, Claim One, Subpart (7), is procedurally defaulted pursuant to an independent and adequate state procedural rule. *See Hunt v. Houston*, 563 F.3d 695, 703 (8th Cir. 2009) ("Federal courts generally will not review claims that a state court has refused to consider because of the petitioner's failure to satisfy a state procedural requirement."); *Shaddy v. Clarke*, 890 F.2d 1016, 1018 (8th Cir. 1989) ("[O]nly if the state court issues a 'plain statement' that it is rejecting petitioner's federal claim on state procedural grounds will federal habeas courts be precluded from reaching the merits of the claim."). The claim is now procedurally defaulted, not unexhausted, because the Nebraska courts would not entertain a successive postconviction motion based on that claim. *See Sims*, 761 N.W.2d at 533.

Alternatively, the court finds that Custer's claim is without merit. Custer now offers specific facts or arguments in his Petition and Reply Brief in support of his allegation that trial counsel was ineffective for failing to call Breen to testify at trial. Namely, Custer proffers that Breen would have testified that Custer and McCormick "pulled knives on each other" about one week before the shooting, with Custer "pulling a knife" only after McCormick had pulled his knife. (Filing 1 at CM/ECF pp. 18, 32; Filing 19 at CM/ECF pp. 12-15.) Custer argues that this testimony would have corroborated his own testimony that he acted in self-defense and would have carried "more weight" with the jury than his testimony alone. (Filing 19 at CM/ECF pp. 12-15.) But as the Nebraska Supreme Court noted, the jury heard testimony from Fields corroborating Custer's testimony that he acted in self-defense. Thus, the jury did in fact hear testimony from someone other than Custer that supported Custer's self-defense theory, which the jury clearly rejected, instead finding him guilty of

first degree murder. Moreover, Custer cannot show that he was prejudiced by trial counsel's failure to call Breen as a witness at trial. Even if Breen would have testified that Custer told him that Custer and McCormick "pulled knives" on each other about a week before the shooting, this testimony would not have provided a basis for the jury to find that Custer feared for his life and acted in self-defense at the time of the shooting. (*See* Claim One, Subpart (6), *supra*; Filing 9-2 at CM/ECF p. 7.) Rather, the evidence at trial showed that Custer confronted McCormick on the night of the shooting despite the alleged prior knife incident. (*See* Claim One, Subpart (6), *supra*; Filing 9-2 at CM/ECF p. 7.) Therefore, Custer fails to demonstrate a reasonable probability that, but for trial counsel's failure to call Breen as a witness at trial, the result of the proceeding would have been different.

## B.  Claim Two

In Claim Two, Custer argues that he was denied the effective assistance of counsel because appellate counsel failed to raise on direct appeal the ineffective assistance of trial counsel claims described in Claim One, Subparts (1) through (3) and (5) through (7). (Filing 1 at CM/ECF pp. 17-19, 27, 32.) Custer did not raise any ineffective assistance of appellate counsel claims to the Nebraska Supreme Court on postconviction appeal. As a result, Custer has not invoked "one complete round" of Nebraska's appellate review process. Because these claims were previously available to Custer, Nebraska courts would not consider a successive postconviction motion based on these claims. *See Sims*, 761 N.W.2d at 533. Therefore, Claim Two is procedurally defaulted. Even assuming *Martinez* applies to federal habeas corpus cases arising from Nebraska convictions, *Martinez*'s narrow exception to the procedural default doctrine does nothing to excuse the procedural default of Claim Two. The Supreme Court has determined that *Martinez* does not apply to defaulted ineffective assistance of appellate counsel claims. *See Davila v. Davis*, 137 S. Ct. 2058, 2063 (2017).

Moreover, the ineffective assistance of appellate counsel claims in Claim Two are meritless. Custer's counsel was the same on direct appeal as at trial, and therefore

that same counsel could not raise their own ineffectiveness on direct appeal. *See State v. Payne*, 855 N.W.2d 783, 786 (Neb. 2014) ("Where trial counsel and appellate counsel are the same, a postconviction motion is a defendant's first opportunity to raise a claim of ineffective assistance of trial counsel. This is so because counsel cannot be expected to argue his or her own ineffectiveness; to require such would create the potential for a conflict of interest."). Accordingly, Custer is not entitled to habeas relief on Claim Two.

## C.  Claim Three

In Claim Three, Custer claims that he was denied the effective assistance of counsel because the cumulative instances of ineffective assistance of trial and appellate counsel create the reasonable probability of a different outcome at either the trial and/or direct appeal level. (Filing 1 at CM/ECF p. 20.) Like Claim Two, Custer did not raise Claim Three in his postconviction appeal to the Nebraska Supreme Court. As a result, Custer has not invoked "one complete round" of Nebraska's appellate review process. Because this claim was previously available to Custer, Nebraska courts would not consider a successive postconviction motion based on this claim. *See Sims*, 761 N.W.2d at 533. Therefore, Claim Three is procedurally defaulted, not unexhausted.

Alternatively, the court finds that Claim Three is without merit. The Eighth Circuit Court of Appeals has stated, "In our circuit a habeas petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test." *Hall v. Luebbers*, 296 F.3d 685, 692 (8th Cir. 2002) (citing *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996), *cert. denied*, 519 U.S. 968 (1996)). As discussed above, Custer has not established that any of the alleged individual errors by counsel constituted ineffective assistance and, therefore, he cannot build a showing of prejudice based on an allegation of a series of errors. Custer's claim of ineffective assistance, based on alleged cumulative errors, fails.

## D.  Claim Four

In Claim Four, Custer contends that he was denied his rights to due process and a fair trial because (1) the evidence adduced at trial was insufficient to sustain a conviction for first degree murder, because a rational trier of fact could not have concluded that Custer killed Adam McCormick purposely, with deliberate and premediated malice, and not in self-defense (filing 1 at CM/ECF pp. 17, 21); and (2) the trial court erroneously instructed the jury (*id*. at CM/ECF pp. 2, 17, 28).

### 1.  Subpart (1)

First, Custer argues that he was denied his rights to due process and a fair trial because the evidence adduced at trial was insufficient to sustain a conviction for first degree murder, because a rational trier of fact could not have concluded that Custer killed Adam McCormick purposely, with deliberate and premediated malice, and not in self-defense. (*Id*. at CM/ECF pp. 17, 21.) The Nebraska Supreme Court considered and rejected this claim on direct appeal. The court wrote:

> Custer claims that there was not sufficient evidence to sustain a conviction for first degree murder because the evidence did not show that he killed McCormick with deliberate and premeditated malice. The theory of Custer's defense was essentially that he killed McCormick in self-defense. The State contends that its evidence established that Custer committed first degree murder, that there was no sudden quarrel, and that Custer did not kill McCormick in self-defense. We conclude that there was sufficient evidence from which the jury could have found that Custer committed first degree murder.

> As an initial matter, we note that Custer's claim of insufficient evidence of deliberate and premeditated malice relies in part on his argument, which we rejected above,[9] that premeditation cannot be "instantaneous" because instantaneous premeditation is synonymous with intent formed simultaneously with the act. To the extent Custer's argument is that

---

[9] This argument will be discussed below.

there was not sufficient evidence of premeditation because the State proved only instantaneous premeditation, we reject such argument, because instantaneous premeditation is sufficient.

Custer's main argument is that there was insufficient evidence of first degree murder, because there was evidence that he did not come to Leal's house planning to kill McCormick, that he instead came to settle the dispute over the money he owed to McCormick, that he grabbed the gun from the back seat of the truck only after he became concerned that he was being set up, and that he did not shoot McCormick until McCormick lunged at him with a knife. Custer contends that this evidence shows that the killing was not done with deliberate and premeditated malice and that instead, it was done upon a sudden quarrel and in self-defense.

Although there was evidence in support of the version of events as urged by Custer, the State presented evidence which contradicted Custer's version of how the incident occurred and from which the jury could have found that Custer killed McCormick with deliberate and premeditated malice and that the killing did not result from a sudden quarrel and was not justified as self-defense. The State's evidence included the testimony by Leal and by Wright which indicated that Custer got out of the truck armed with a gun, left the engine running, walked toward McCormick, and shot him twice within seconds—all before a sudden quarrel developed or self-defense was justified.

The main evidence supporting Custer's version of events was his testimony in his own defense. But he also directs our attention to physical evidence, including evidence regarding the trajectory of the gunshots, which he asserts supports his version of events over the version of events recounted by other witnesses. Thus, in this trial, there was conflicting testimony regarding the events surrounding the shooting, and there was other evidence which the jury may have found relevant to its determination of the accuracy or credibility of the witnesses' testimony. As the finder of fact, the jury resolved the tension and conflicts in the evidence.

In reviewing a claim that the evidence was insufficient to support a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence;

such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Davis*, 290 Neb. 826, 862 N.W.2d 731 (2015).

Viewing the evidence in the light most favorable to the State, we conclude that the evidence was sufficient to support Custer's conviction for first degree murder. We therefore reject this assignment of error.

(Filing 9-1 at CM/ECF pp. 13-14.)

The court's review of a habeas petition that alleges insufficiency of the evidence is governed by *Jackson v. Virginia*, 443 U.S. 307 (1979):

In *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court articulated a narrow standard of review for questions of sufficiency of the evidence. Under *Jackson*, a habeas petitioner is entitled to relief if [the court] conclude[s] that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt. In applying this standard, [the court] do[es] not re-weigh the evidence, and [the court] must resolve inconsistencies in favor of the prosecution. Under AEDPA, [the court] may grant relief only if [it] find[s] the [Nebraska Supreme Court's] conclusion that the evidence satisfied the *Jackson* sufficiency of the evidence standard both incorrect and unreasonable.

*Brende v. Young*, 907 F.3d 1080, 1085 (8th Cir. 2018), *cert. denied*, 140 S. Ct. 74 (2019), *reh'g denied*, 140 S. Ct. 634 (2019) (quoting *Nash v. Russell*, 807 F.3d 892, 897 (8th Cir. 2015)).

Having reviewed the trial transcripts and evidence in Custer's criminal trial, the court finds that the Nebraska Supreme Court's adjudication of Claim Four, Subpart (1), did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. The Nebraska Supreme Court admittedly did not cite *Jackson v. Virginia*, the seminal United States Supreme

Court decision on sufficiency of the evidence, but "[a] reasonable application of established federal law 'does not require citation of [United States Supreme Court] cases—indeed, it does not even require *awareness* of [the] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *See Cox v. Burger*, 398 F.3d 1025, 1030 (8th Cir. 2005) (quoting *Early v. Packer*, 537 U.S. 3, 8, (2002)) (emphasis in original). The Nebraska Supreme Court did, however, correctly apply the essence of *Jackson v. Virginia* to the question of whether the evidence was sufficient to support Custer's conviction for first degree murder, and the Nebraska Supreme Court did so in an objectively reasonable manner; neither the reasoning nor the result contradicts *Jackson v. Virginia*.

Custer has also not shown that the adjudication of the claim by the Nebraska Supreme Court resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. The Nebraska Supreme Court found that the State presented evidence that contradicted Custer's version of how the incident occurred and from which the jury could have found that Custer killed McCormick with deliberate and premeditated malice and that the killing did not result from a sudden quarrel and was not justified as self-defense, including testimony by Leal and by Wright that Custer got out of the truck armed with a gun, left the engine running, walked toward McCormick, and shot him twice within seconds—all before a sudden quarrel developed or self-defense was justified. These facts are confirmed by the trial transcripts. Thus, the Nebraska Supreme Court could, and did, find the evidence sufficient to support Custer's conviction for first degree murder.

Given the foregoing, the court finds that Custer cannot overcome the barrier posed by 28 U.S.C. 2254(d). There is no merit to his claim that the evidence was insufficient to support his conviction for first degree murder.

## 2.  Subpart (2)

Second, Custer argues that he was denied his rights to due process and a fair trial because the trial court erroneously instructed the jury. (Filing 1 at CM/ECF pp. 2, 17, 28.) Specifically, he asserts that the trial court erred when it (1) failed to instruct the jury regarding a choice of evils defense to the charge of being a felon in possession of a firearm and (2) gave an instruction defining premeditation which included language that was not included in the statutory definition of premeditation. (*Id.* at CM/ECF pp. 28-31.)

The court will briefly discuss the relevant federal law so that it may apply it later in a summary fashion as it reviews Custer's claims.

"The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). The question in such a collateral proceeding is whether an improper jury instruction "constitute[s] a fundamental defect that results in a complete miscarriage of justice or so infects the entire proceeding as to deprive the defendant of a fair trial," *Stewart v. Nix*, 972 F.2d 967, 971 (8th Cir. 1992) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *see also Williams v. Lockhart*, 736 F.2d 1264, 1267 (8th Cir. 1984), not merely whether an instruction "is undesirable, erroneous, or even 'universally condemned,'" *Cupp*, 414 U.S. at 146. "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 67-68, 71-72 (1991). In addition, it is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. *Cupp*, 414 U.S. at 147.

### a. Choice of Evils Defense

On direct appeal, Custer argued that the trial court erred when it refused to instruct the jury regarding a choice of evils defense to the charge of being a felon in possession of a firearm. Custer made no constitutional due process argument to the Nebraska Supreme Court but relied instead on state law. Consequently, the Nebraska Supreme Court did not consider whether the lack of a choice of evils instruction violated Custer's federal due process rights. Instead, the Nebraska Supreme Court examined whether the trial court erred, solely on state law grounds, by failing to instruct the jury regarding a choice of evils defense to the felon in possession of a firearm charge. For these reasons, Custer did not fairly present a federal due process argument in the Nebraska state courts in one complete round of review as required by 28 U.S.C. § 2254(b)(1). Accordingly, Custer's federal due process claim is procedurally defaulted.

Appellate counsel's failure to raise this issue on direct appeal does not excuse the procedural default. "A claim of ineffective assistance of counsel must be presented to the state court as an independent claim before it may be used to establish cause for procedural default or denominated as a ground for habeas relief." *Leggins v. Lockhart*, 822 F.2d 764, 768 n.5 (8th Cir. 1987) (citing *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986)). A federal habeas court is barred from considering an ineffective assistance of counsel claim as cause for the procedural default of another claim when the ineffective assistance claim has itself been inexcusably procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 451-53 (2000). Custer did not present any independent ineffective assistance of appellate counsel claim in one complete round of review in the Nebraska state courts. Thus, the actions of appellate counsel cannot serve as cause to excuse the procedural default of Custer's due process claim related to the choice of evils instruction.

In the alternative, the court finds that the claim is without merit. In addressing the trial court error claim on direct appeal, the Nebraska Supreme Court wrote:

Custer first claims that the district court erred when it refused to instruct the jury regarding a choice of evils defense to the charge of being a felon in possession of a firearm. Custer failed to include his proposed instruction in the record on appeal, and we are not able to review the instruction on appeal. However, even if we favor Custer with various assumptions, a choice of evils instruction was not warranted by the evidence and we reject this assignment of error.

The record of the jury instruction conference shows that Custer objected to the court's proposed instruction setting forth the elements of being a felon in possession of a firearm and that his objection was based on the failure to include language regarding a choice of evils defense. The parties argued their respective positions regarding whether such language should be included, and the court determined that an instruction regarding choice of evils was not appropriate under the facts of this case.

Although the court indicated at the jury instruction conference that a proposed instruction was on file, Custer did not include a proposed choice of evils instruction in the record on appeal. Custer needed to show that his tendered instruction was a correct statement of law and that it was warranted by the evidence. See *Planck*, *supra*. In order to do so, he needed to include his proposed instruction in the record on appeal. It is incumbent upon an appellant to supply a record which supports his or her appeal. *State v. Robinson*, 287 Neb. 799, 844 N.W.2d 312 (2014). Because Custer did not include the proposed instruction in the record on appeal, "we have no instruction to review in order to determine whether it ought to have been given." See *id.* at 805, 844 N.W.2d at 318.

Custer argues that although the proposed instruction is not included in the record, it is clear from the arguments of counsel at the jury instruction conference that Custer requested an instruction that followed the language of Neb. Rev. Stat. § 28-1407 (Reissue 2008). He asserts that the same language was proposed by the defendant in *State v. Mowell*, 267 Neb. 83, 672 N.W.2d 389 (2003). In *Mowell*, we stated that the defendant had presented an instruction which set forth the choice of evils defense provided by § 28-1407 and that the choice of evils defense

48

> requires that a defendant (1) acts to avoid a greater harm;
> (2) reasonably believes that the particular action is
> necessary to avoid a specific and immediate harm; and (3)
> reasonably believes that the selected action is the least
> harmful alternative to avoid the harm, either actual or
> reasonably believed by the defendant to be certain to
> occur.

267 Neb. at 94, 672 N.W.2d at 399. We did not decide in *Mowell*
whether the instruction proposed by the defendant was a correct
statement of law, and we further questioned whether a choice of evils
justification was available as a defense to a charge of being a felon in
possession of a firearm. Without deciding either issue, we assumed for
the sake of argument that the proposed instruction was a correct
statement of law and that the defense was generally available against a
charge of being a felon in possession of a firearm. Having made such
assumptions, we nevertheless concluded that under the facts of the case
at hand, the defendant in *Mowell* was not entitled to an instruction on
the choice of evils defense. If we were to make the same assumptions
in this case, and if we were to assume that Custer's proposed instruction
was based on the language of § 28-1407, similar to *Mowell*, we would
again conclude that the evidence in this case did not entitle the
defendant, Custer, to a choice of evils instruction.

In *Mowell*, we emphasized that the choice of evils defense requires that
the defendant's actions are "'necessary to avoid a specific and
immediately imminent harm'" and that "generalized and nonimmediate
fears are inadequate grounds upon which to justify a violation of law."
267 Neb. at 96, 672 N.W.2d at 400. After reviewing the evidence in
*Mowell*, we noted that "even if [the defendant] felt threatened and
harassed by [the victim] to a point where he feared for his safety, [the
defendant] had ample opportunity" to avoid the danger. 267 Neb. at 97,
672 N.W.2d at 401.

Custer argues that the facts of the present case are different from those
in *Mowell*, because the threat in *Mowell* was vague and the defendant
in *Mowell* possessed the firearm for a longer period of time. He
contends that in this case, McCormick's threats against him "were far
more repeated, direct, and unambiguous," brief for appellant at 23, and

that he did not possess the firearm until he was faced with a specific and immediate harm.

Although the facts of this case differ from those in *Mowell*, the evidence in this case does not show that at the time Custer took possession of the firearm he faced a specific and immediately imminent harm. The evidence most favorable to Custer was his own testimony that when he arrived at Leal's house, he saw that McCormick was still there and that, fearing that he was being set up, he retrieved the gun from the back seat of the truck. At the time he retrieved the gun, Custer was still inside the truck and he had the opportunity to drive away; instead, he grabbed the gun, got out of the truck, and walked toward McCormick. Under Custer's version of events, he did not face a specific and immediately imminent harm until McCormick rushed at him with a knife, which did not occur until after Custer had already grabbed the gun, gotten out of the truck, and approached McCormick. That is, Custer possessed the firearm—the crime of which he was convicted—not to avoid a specific and immediate harm, but instead, before the harm developed. Therefore, even if we were to assume Custer tendered a proposed instruction that followed the language of § 28-1407, and the defense was available to a charge of being a felon in possession of a firearm, we conclude that the district court did not err when it determined that a choice of evils instruction was not warranted by the evidence in this case.

(Filing 9-1 at CM/ECF pp. 10-11.)

Custer has not demonstrated that the state courts' factual determination concerning the applicability of the choice of evils defense was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). Moreover, Custer has failed to demonstrate any constitutional deprivation in that the trial court's refusal to give a choice of evils instruction in accordance with state law does not establish the type of fundamental unfairness that would deny due process. *See Estelle*, 502 U.S. at 75. Indeed, Custer cannot predicate a due process violation on the failure to give an instruction on a factually inapplicable defense. Therefore, Custer is not entitled to habeas relief on Claim Four, Subpart (2) (choice of evils instruction).

### b.  Premeditation Instruction

Custer next claims that he was denied his rights to due process and a fair trial because the trial court erroneously gave an instruction defining premeditation which included language that was not included in the statutory definition of premeditation. Custer raised this due process argument on direct appeal. (Filing 9-5 at CM/ECF p. 34.) The Nebraska Supreme Court resolved the claim on state law grounds. The court wrote:

> Custer next claims that the district court erred when it gave an instruction defining premeditation which included language that was not included in the statutory definition of premeditation. We conclude as a matter of law that the district court did not err when it gave the instruction.
>
> The district court gave jury instruction No. 7 which instructed the jury on definitions of various terms relevant to the charges against Custer. The instruction included a definition of premeditation based on NJI2d Crim. 4.0. The court instructed: "Premeditation means to form the intent to do something before it is done. The time needed for premeditation may be so short as to be instantaneous provided that the intent to act is formed before the act and not simultaneously with the act." Custer objected to the second sentence of the definition for premeditation because it did not conform to the statutory definition of premeditation under Neb. Rev. Stat. § 28-302 (Reissue 2008). The definition of premeditation in jury instruction No. 7 is nearly identical to the definition provided in NJI2d Crim. 4.0. In comparison to instruction No. 7, § 28-302(3) provides one sentence, i.e.: "Premeditation shall mean a design formed to do something before it is done," but does not contain a second sentence regarding the time needed for premeditation.
>
> The argument made by Custer regarding the variance between the statutory definition in § 28-302(3) and instruction No. 7 was rejected by this court in *State v. Taylor*, 282 Neb. 297, 803 N.W.2d 746 (2011). In *Taylor*, we noted that the second sentence of NJI2d Crim. 4.0 had "apparently been added to further specify the meaning of 'before' as it was used in § 28-302(3)." 282 Neb. at 310, 803 N.W.2d at 758. We

reviewed our precedent to the effect that no particular length of time for premeditation is required, provided that the intent to kill is formed before the act is committed and not simultaneously with the act that caused the death, as well as other precedent to the effect that the duration of time required to establish premeditation may be so short that it is instantaneous. *Id.*

Custer argues that the instruction was erroneous because "these two words ['instantaneous' and 'simultaneous'] are synonyms that mean something occurring in the same moment." Brief for appellant at 30. He contends that instructing the jury that premeditation may be "instantaneous" violates the statutory requirement that intent must be formed before the act is done. We disagree.

"Instantaneous" is defined as "done, occurring, or acting without any perceptible duration of time," Webster's Third New International Dictionary of the English Language, Unabridged 1171 (1993), whereas "simultaneous" is defined as "existing or occurring at the same time," *id.* at 2122. The two words are not synonymous; "instantaneous" refers to the passage of time during which something occurs, while "simultaneous" refers to the point in time at which two or more things occur. Thus, premeditation may occur instantaneously, or in an amount of time of imperceptible duration, but without occurring simultaneously with, or at the same point in time as, the act. The instruction makes it clear that although premeditation may be instantaneous, it must nevertheless occur before the act and not simultaneous with it. The instruction therefore does not contradict the statutory requirement that premeditation must occur before the act. The instruction instead explains that, while premeditation must occur before the act and not simultaneous with it, premeditation need not occur for any minimal duration of time and may occur in an instant, that is, may be instantaneous. Custer also argues that the instruction is a violation of the separation of powers because it adds to the definition of premeditation provided by the Legislature. However, a court's proper role is to interpret statutes and clarify their meaning. See *Taylor, supra.* The instruction given in this case interprets and clarifies the statutory definition; it does not change or contradict the statutory definition.

Similar to our discussion in *Taylor, supra*, we conclude that jury instruction No. 7 in this case conformed to our interpretation of

> premeditation as it is used in § 28-302(3). Accordingly, as a matter of law, the district court did not err when it gave the definition of premeditation in instruction No. 7, and we reject this assignment of error.

(Filing 9-1 at CM/ECF pp. 11-13.)

The court finds that the Nebraska Supreme correctly determined that the trial court properly instructed the jury on the definition of premeditation. Although the instant Jury Instruction No. 7 did contain a statement indicating that the intent "may be so short as to be instantaneous," the jury instructions clearly provided that the intent must be "formed before the act and not simultaneously with the act." (Filing 9-11 at CM/ECF p. 26.) The court finds that the jury instructions, considered in their entirety, sufficiently and explicitly convey the principle that Custer's mental state, at the time of the crime, must have been the result of reflection and judgment and free from excitement and passion for Custer to be capable of premeditation. (*See id.* at CM/ECF pp. 20-22, 26-27.) Custer has not directed the court's attention to any Supreme Court case, nor has the court found such a case in its research, which demonstrates that the instruction did not comply with constitutional principles. The jury instructions given by the trial court in Custer's case sufficiently informed the jury of their constitutional duty to consider whether the homicide committed by Custer was accompanied by the premeditation and deliberation necessary to convert the killing into first degree murder. Thus, Custer has failed to demonstrate that the premeditation instruction, given in accordance with state law, constituted a fundamental defect in the proceedings which resulted in a complete miscarriage of justice. Accordingly, the court determines that Claim Four, Subpart (2) (premeditation instruction), is without merit and is denied.

## E.  Claim Five

In Claim Five, Custer claims that he was denied due process because the State committed prosecutorial misconduct by (1) arguing his post-arrest silence, (2) introducing inflammatory, religious-themed arguments and testimony into the trial,

and (3) "brow-beating" Custer with questions already asked and answered. (Filing 1 at CM/ECF pp. 17, 26.)

The court will briefly discuss the relevant federal law so that it may apply it later in a summary fashion as it reviews Custer's claims.

A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The Eighth Circuit has construed the rule set forth in *Darden* as a two-part test for prosecutorial misconduct: (1) the prosecutor's remarks or conduct must have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial. *United States v. Conrad*, 320 F.3d 851, 855 (8th Cir. 2003); *Young v. Bowersox*, 161 F.3d 1159, 1162 (8th Cir. 1998). Thus, if the reviewing court does not find the remarks to have been improper, the court does not reach the second step of determining whether they deprived the defendant of his constitutional right to due process. *Basile v. Bowersox*, 125 F. Supp. 2d 930, 941 (E.D. Mo. 1999). If the reviewing court does reach the second step, the court must examine "the totality of the circumstances" in order to determine the effect of the prosecutor's remarks or conduct. *Walls v. Bowersox*, 151 F.3d 827, 836 (8th Cir. 1998). The challenged statements, when read in the entire context of the proceedings, must "fundamentally taint the proceedings" to warrant federal habeas relief. *Id.* at 837 (citing *Darden*, 477 U.S. at 181). "Under this standard, a petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial—i.e., that absent the alleged impropriety, the verdict probably would have been different." *Kellogg v. Skon*, 176 F.3d 447, 451 (8th Cir. 1999).

## 1. Subpart (1)

Custer claims that he was denied due process because the State committed prosecutorial misconduct by arguing his post-arrest silence. (Filing 1 at CM/ECF pp. 17, 26.) The Nebraska Supreme Court considered and rejected this claim on direct appeal as follows:

> Custer next claims that the State committed prosecutorial misconduct when it made certain statements during closing arguments. Custer takes issue with the State's comments regarding the amount of time he had to prepare his testimony for trial and the State's comments highlighting his failure to report the shooting and McCormick's alleged aggressive actions to the police. He contends that the statements were improper comments on the exercise of his right to remain silent. We conclude that the State's comments during closing arguments were not improper and did not constitute prosecutorial misconduct.
>
> We note that Custer did not object when the State questioned him about these issues on cross-examination or when the State remarked on these issues during closing arguments; the claim on appeal is limited to the prosecutor's comments made during closing arguments. When a party has knowledge during trial of irregularity or misconduct, the party must timely assert his or her right to a mistrial. *State v. Stricklin*, 290 Neb. 542, 861 N.W.2d 367 (2015). A party who fails to make a timely motion for mistrial based on prosecutorial misconduct waives the right to assert on appeal that the court erred in not declaring a mistrial due to such prosecutorial misconduct. *Id.*
>
> Although Custer acknowledges that he failed to object to the alleged prosecutorial misconduct at trial, he argues that we should note the alleged misconduct as plain error. When a defendant has not preserved a claim of prosecutorial misconduct for direct appeal, we will review the record only for plain error. *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014). We apply the plain error exception to the contemporaneous-objection rule sparingly. *State v. Alarcon-Chavez*, 284 Neb. 322, 821 N.W.2d 359 (2012). Therefore, in this case, we will review the record for plain error with regard to Custer's allegations of prosecutorial misconduct.

An appellate court may find plain error on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *Id.* Generally, we will find plain error only when a miscarriage of justice would otherwise occur. *Id.*

Prosecutorial misconduct encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial. *Dubray, supra.* In assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper. It is then necessary to determine the extent to which the improper remarks had a prejudicial effect on the defendant's right to a fair trial. *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013). The first step in our analysis, then, is to determine whether the State's comments to the jury regarding the amount of time Custer had to consider his testimony and Custer's failure to report the incident were improper.

With regard to whether remarks made during closing arguments are improper, we have stated that prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial, and prosecutors are not to inflame the prejudices or excite the passions of the jury against the accused. *Id.* A prosecutor's conduct that does not mislead and unduly influence the jury does not constitute misconduct. *Id.*

Custer asserts that it was improper for the State to note that Custer did not report to police his allegations that McCormick had threatened him with a knife, which allegations form the basis for his claim of self-defense. The State further noted that Custer had 15 months and the advantage of hearing other witnesses' testimony in order to prepare his testimony in his own defense. The State contrasted this with the trial testimony of Leal and Wright, which was consistent with statements they gave to police within hours after the incident.

Custer argues that these comments by the prosecutor violated a line of cases beginning with *Doyle v. Ohio*, 426 U.S. 610, 611, 96 S. Ct. 2240, 49 L.Ed.2d 91 (1976), in which the U.S. Supreme Court held that the

State may not "seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest." In *Fletcher v. Weir*, 455 U.S. 603, 607, 102 S. Ct. 1309, 71 L.Ed.2d 490 (1982), the U.S. Supreme Court clarified that the *Doyle* rule did not necessarily apply to a prosecutor's remarks about a postarrest silence occurring before *Miranda* warnings and stated:

> In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings [to the effect that his silence will not be used against him or her], we do not believe that it violates due process of law for a State to permit cross-examination as to [pre-*Miranda*] postarrest silence when a defendant chooses to take the stand.

Similar to *Fletcher, supra*, in Nebraska, we have stated that "it is not a violation of fundamental fairness for the State to use a defendant's pre-*Miranda* silence as impeachment or as substantive evidence of sanity." *State v. Harms*, 263 Neb. 814, 824-25, 643 N.W.2d 359, 371 (2002). We have explicitly extended the protection of *Doyle* to a prosecutor's comments on the defendant's silence made in closing argument. See *State v. Lopez*, 274 Neb. 756, 743 N.W.2d 351 (2008). The *Doyle* challenge in the instant case is to the prosecutor's remarks during closing argument.

Custer directs our attention to *State v. Lofquest*, 227 Neb. 567, 418 N.W.2d 595 (1988). In *Lofquest*, we noted that the State's remarks, some of which were made during the prosecutor's closing, referred to the defendant's failure to tell his story to police at any time prior to the trial. We stated in *Lofquest* that the dispositive factor with respect to a prosecutor's remarks regarding a defendant's silence is the period of silence to which the prosecutor referred—that is, whether it is the period before or the period after the defendant received *Miranda* warnings. We determined that the prosecutor's "generalized questions and comments [made] it nearly impossible to discern, for purposes of a *Doyle* inquiry, what period of silence the prosecution was referring to, pre-*Miranda* or post-*Miranda*" and that "the prosecutor's remarks could be construed as referring to [the defendant's] silence from the first police contact through the moment before [the defendant] told his story at trial." 227 Neb. at 570, 418 N.W.2d at 597. We concluded that

57

the prosecutor's remarks in *Lofquest* were improper because "[w]e cannot allow prosecutors to sidestep the *Doyle* protections by skirting the edge of the law with vague and imprecise references to a defendant's silence." 227 Neb. at 570, 418 N.W.2d at 597.

Custer argues that, similar to *Lofquest*, the State's remarks made during closing argument in this case encompassed the entire period until he testified at trial and that the remarks were therefore improper. However, we note that the remarks in which the State referred specifically to Custer's silence clearly pertained to a time before his arrest and before *Miranda* warnings were given. During closing arguments, the State discussed Custer's actions immediately after the shooting and stated that he did not call police. The State remarked, "He even sees the police car drive by and never bothers to tell anybody that he was just in this life and death struggle. Never tells the police about that." These remarks clearly refer to Custer's silence at a time before he was arrested and given *Miranda* warnings. They were unlike the remarks we found improper in *Lofquest, supra*, in which the State imprecisely referred to the defendant's silence prior to trial, which period might have included times after the defendant received post-*Miranda* warnings.

Custer argues that in addition to the remarks discussed above specifically referring to Custer's failure to report the incident to police, the State's remarks regarding the amount of time he had to prepare his testimony prior to trial were effectively improper comments on his silence. He argues that the time period before trial necessarily includes some time after his arrest and after he invoked his rights. He notes that in closing arguments, the State remarked that "Custer wrapped his story around the forensics after having 15 months to look at it by hearing the testimony about seeing—here's the angle here and know that [McCormick] go [sic] wounded right here," and later repeated that "Custer forms his story around the forensics."

We do not read these remarks as commenting on Custer's silence after his arrest and after invocation of his right to remain silent. Instead, the remarks are similar to those in *State v. Jacob*, 253 Neb. 950, 974, 574 N.W.2d 117, 137 (1998), *abrogated on other grounds*, *State v. Nolan*, 283 Neb. 50, 807 N.W.2d 520 (2012), in which the prosecutor stated during closing arguments that before the defendant testified at trial, he "'had five years to think of his answers, five years to run through all of

this. Five years to prepare'" and that he had "'sat through this trial and heard every witness and every question.'" We characterized the State's remarks in *Jacob* as commenting on the defendant's credibility and as implying that "in evaluating the credibility of [the defendant's] testimony, the jury should consider that [the defendant] had the benefit of first hearing all the witnesses' testimony and had 5 years to prepare his testimony." *Id.* at 975-76, 574 N.W.2d at 138. We stated that we found "nothing in the argument that can be construed as a comment on [the defendant's] silence." *Id.* at 976, 574 N.W.2d at 138. Similar to the remarks in *Jacob*, the remarks by the State in closing argument in this case were directed to the credibility of Custer's testimony rather than remarks on Custer's silence.

We conclude that the State's remarks during closing arguments were not improper, and we therefore need not consider whether the comments prejudiced Custer's right to a fair trial. Because there was no prosecutorial misconduct and no plain error, we reject Custer's assignment of error.

(Filing 9-1 at CM/ECF pp. 14-16.)

The Nebraska Supreme Court's adjudication of this claim was not objectively unreasonable and was not contrary to, or an unreasonable application of, clearly established federal law. In *Doyle v. Ohio*, 426 U.S. 610, 619 (1976), the Supreme Court held "that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." The theory underlying *Doyle* is that while *Miranda* warnings contain no express assurance that silence will carry no penalty, "such assurance is implicit to any person who receives the warnings." *Id.* at 618. On this reasoning, the Supreme Court concluded that it would be fundamentally unfair first to induce a defendant to remain silent through *Miranda* warnings and then to penalize the defendant who relies on those warnings by allowing the defendant's silence to be used to impeach an exculpatory explanation offered at trial. *Id.* However, *Doyle* applies only in the context of post-*Miranda* silence. In cases following *Doyle*, the Supreme Court held that the Fifth and Fourteenth Amendments permit a defendant to be impeached with his pre-arrest pre-*Miranda* silence, *Jenkins*

*v. Anderson*, 447 U.S. 231, 238 (1980), or post-arrest pre-*Miranda* silence, *Fletcher v. Weir*, 455 U.S. 603, 607 (1982), if he later takes the stand during his criminal trial.

Consistent with federal law, when finding the issue of Claim Five, Subpart (1), without merit, the Nebraska Supreme Court considered what the prosecutor argued during closing argument at Custer's trial and concluded that the arguments were not improper under the *Doyle* rule. As to the prosecutor's comment on Custer's silence during closing argument, the Nebraska Supreme Court reasonably determined that the comment referred to a pre-arrest and pre-*Miranda* time period and thus did not constitute *Doyle* violations. The most logical understanding of the prosecutor's remarks was as an attempt to use Custer's pre-arrest silence to undermine his theory of self-defense. As to the prosecutor's remarks regarding the amount of time Custer had to prepare his testimony before trial, the Nebraska Supreme Court's determination that the remarks were directed to the credibility of Custer's testimony, rather than remarks on Custer's silence in violation of *Doyle*, was reasonable in light of the facts and the relevant law. When read in context, it is evident that the prosecutor's comment was intended to attack the credibility of Custer's trial testimony by urging the jury to consider that Custer had the benefit of first hearing all the witnesses' testimony and had 15 months to prepare his testimony while Leal and Wright testified consistently with statements they gave to police within hours after the incident. Finally, in light of its determination that the prosecutor's arguments were not improper, the Nebraska Supreme Court's conclusion that it need not consider whether those arguments prejudiced Custer's right to a fair trial was not contrary to, or an unreasonable application of, federal law. The court finds, therefore, that Claim Five, Subpart (1), is without merit and that Custer in not entitled to habeas relief on its basis.

## 2.  Subparts (2) and (3)

Custer claims that he was denied due process because the State committed prosecutorial misconduct by introducing inflammatory, religious-themed arguments and testimony into the trial (Subpart 2) and by "brow-beating" Custer with questions

60

already asked and answered (Subpart 3). (Filing 1 at CM/ECF pp. 17, 26.) Claim Five, Subparts (2) and (3), are procedurally defaulted because they were not raised on direct appeal. Appellate counsel's failure to raise these issues on direct appeal does not excuse the procedural default because Custer did not present any independent ineffective assistance of appellate counsel claim in one complete round of review in the Nebraska state courts. *See Edwards*, 529 U.S. at 451-53; *Murray*, 477 U.S. at 488-89; *Leggins*, 822 F.2d at 768 n.5. In the alternative, the court finds that the claims are meritless. As discussed in Claim One, Subpart (5), neither instance constituted prosecutorial misconduct. Because the comments in Subparts (2) and (3) were not in fact improper, Custer is not entitled to habeas relief on these claims. *See Young*, 161 F.3d at 1162.

## V.  CERTIFICATE OF APPEALABILITY

A petitioner cannot appeal an adverse ruling on his petition for writ of habeas corpus under 28 U.S.C. § 2254 unless he is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b)(1). The standards for certificates (1) where the district court reaches the merits or (2) where the district court rules on procedural grounds are set forth in *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). The court has applied the appropriate standard and determined that Custer is not entitled to a certificate of appealability.

IT IS THEREFORE ORDERED that the Petition for Writ of Habeas Corpus (filing 1) is denied and dismissed with prejudice. No certificate of appealability has been or will be issued. Judgment will be issued by separate document.

August 7, 2020.                                       BY THE COURT:

                                                      *Richard G. Kopf*

                                                      Richard G. Kopf
                                                      Senior United States District Judge